NO.  94-425

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

WILLIAM LEE JONES, d/b/a JONES EQUIPMENT,

      Plaintiff and Respondent,

   v.

GARY ARNOLD AND JANISE ARNOLD, f/k/a
JANISE AMENT, husband and wife, ROBERT RUBEN
HAYES and MAY ROSEMARIE HAYES, husband and
wife, VERE SIPES, the Estate of BURTON SIPES,
and all other persons, known or unknown
claiming or who might claim any right, title,
estate or interest in or lien or encumbrance
upon the real property described in the Complaint,
adverse to Plaintiff's ownership, or any cloud
upon Plaintiff's title thereto, whether such
claim or possible claim be present or contingent,

      Defendants and Appellants.

APPEAL FROM:   District Court of the Fourth Judicial District,
              In and for the County of Missoula,
              The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

        Raymond P. Tipp; Tipp & Buley, Missoula, Montana

      For Respondent:

        Don Torgenrud, Attorney at Law, St. Ignatius,
        Montana

FILED

AUG 11 1995

Filed. *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  March 9, 1995

        Decided:  August 11, 1995

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

The plaintiff, William Lee Jones (Jones), brought this action to attach the proceeds from the sale of certain real property by defendant, Janise Ament Arnold. Following a bench trial, the District Court for the Fourth Judicial District, Missoula County, entered judgment for plaintiff and ordered execution on the proceeds from the sale of the property at issue. The court also concluded that punitive damages were appropriate, subject to a later hearing to determine the amount. From that judgment, defendants appeal. We reverse.

We address the following issues on appeal:

1. Did the District Court err in determining that the series of conveyances of the subject property were fraudulent under § 31-2-314, MCA (1989)?

2. Did the District Court err by failing to determine that the judgment lien was extinguished by operation of law, thus terminating any rights the plaintiff may have to the subject property?

On March 10, 1986, Jones obtained a judgment, against Gary Arnold (Arnold), individually, in the Fourth Judicial District Court, Missoula County. On February 10, 1989, Arnold and his wife, Janise Ament Arnold (Ament-Arnold), purchased real property, secured by a trust indenture, from the executors of an estate, Charles and Gladys Hall and Vere Sipes, for $11,883. Under the terms of the sale, Arnold and Ament-Arnold paid $2,000 down, with

2

the remainder due in May of 1989.

Shortly after entering into this agreement, Arnold learned of Jones' March 10, 1986, judgment against him. Unable to borrow money due to this judgment, Arnold and Ament-Arnold quit-claimed the property back to the sellers on April 10, 1989. The property was then purchased by Ament-Arnold's step-father, James Clark (Clark).

On May 10, 1989, Clark executed a quit-claim deed for the property to Ament-Arnold. The deed was made out to "Janise Ament, a married woman in her own right . . . . " The deed was not recorded until October 3, 1990.

On December 12, 1990, Ament-Arnold sold the property to Robert and May Hayes (Hayes) under a contract for deed for $38,500. Under the terms of the sale, payments are deposited into an account bearing the name "Janise Arnold." This is an individual account and not a joint account with her husband.

Jones filed an action on February 15, 1991, seeking to attach the proceeds from the sale to Hayes on the basis that the series of transactions concerning the purchase and sale of the property were fraudulent. Subsequently, on March 10, 1992, Jones filed a motion to renew his judgment. The court granted the motion on March 23, 1992, and entered an order renewing the judgment for an additional 6 years.

A bench trial was held on April 12, 1994. The District Court accepted the Agreed Facts as presented in the Pretrial Order, heard testimony and admitted documentary exhibits. Defendants' motion

for a directed verdict was denied.

The District Court entered its Amended Findings of Fact and Conclusions of Law and Judgment on July 6, 1994. The court found that this "series of transfers . . . had the effect of removing Gary Arnold from the title," thereby preventing "execution against the property by Jones . . . while the Arnolds retained the ultimate benefit of the transaction." The court concluded that the series of conveyances were fraudulent, in violation of § 31-2-314, MCA (1989), that Ament-Arnold participated in the fraud, and that actual malice was present.

The court ordered execution on the proceeds from the sale of the property from Ament-Arnold to Hayes and awarded Jones his costs of suit. The court also ordered a subsequent proceeding pursuant to § 27-1-221(7), MCA, to determine punitive damages. The proceeding to determine punitive damages is pending determination of this appeal. Defendants appeal the judgment and the denial of a directed verdict.

The Uniform Fraudulent Conveyance Act (UFCA) was the substantive law in effect in 1989 when the series of transactions at issue took place. The Montana Legislature repealed the UFCA in 1991 and enacted the Uniform Fraudulent Transfer Act (UFTA). Since the UFTA does not expressly state that it is retroactive, we will apply the UFCA, which was the law in effect at the time of the conveyances at issue. McDonald v. Anderson (1993), 261 Mont. 268, 272-73, 862 P.2d 402, 405.

4

Issue 1

Did the District Court err in determining that the series of conveyances of the subject property were fraudulent under § 31-2-314, MCA (1989)?

The District Court found that the series of conveyances at issue here contained several "badges of fraud" from which the court inferred a "fraudulent intent" in violation of § 31-2-314, MCA (1989). Section 31-2-314, MCA (1989), provides:

> **Conveyance made with intent to defraud. Every conveyance** made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors is fraudulent as to both present and future creditors.

This Court will affirm the findings of a trial court sitting without a jury unless the findings are clearly erroneous. Rule 52(a), M.R.Civ.P.; Interstate Production Credit v. DeSaye (1991), 250 Mont. 320, 322, 820 P.2d 1285, 1287.

In DeSaye, this Court adopted a three-part test to determine if a finding is clearly erroneous. The test provides that: (1) the Court will review the record to see if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, the Court will determine if the trial court has misapprehended the effect of the evidence; and (3) if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that a finding is clearly erroneous although there is evidence to support it, if a review of the record leaves the Court with the definite and firm conviction that a mistake has been made. DeSaye, 820 P.2d at 1287.

5

In applying the DeSave test to the case before us on appeal, we first review the record to see if the findings are supported by substantial evidence. Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a scintilla of evidence and may be less than a preponderance of evidence. Yellowstone Basin Properties v. Burgess (1992), 255 Mont. 341, 346, 843 P.2d 341, 344.

The only evidence presented by Jones at trial to support his contention that these conveyances are fraudulent were the deeds for each transfer of the property. There was no evidence presented that would indicate that the transfers were made with actual intent to hinder, delay or defraud Jones as a judgment creditor as prescribed by § 31-2-314, MCA (1989).

The uncontroverted evidence presented at trial showed that Arnold and Ament-Arnold purchased the subject property secured by a trust indenture in February 1989. Under the terms of the agreement, they paid $2,000 down against the total purchase price of $11,883 and were required to pay the remaining $9,883 in May 1989. Unable to secure adequate financing for the May payment due to Jones' March 10, 1986, judgment lien, they transferred the property back to the original owners rather than be subjected to foreclosure proceedings. Ament-Arnold testified that they lost their original $2,000 investment in the property.

The presumption that private transactions are fair and regular is conclusive unless controverted by other evidence. Lawrence v. Clepper (1993), 263 Mont. 45, 56, 865 P.2d 1150, 1158. Jones

6

presented no evidence at trial to indicate that this conveyance back to the original sellers was made with an intent to defraud him or prevent him from executing on the judgment lien.

Neither did he present any evidence that would indicate that the subsequent purchase of the property by Ament-Arnold's step-father and the later transfer of the property to Ament-Arnold was done with an intent to defraud Jones and prevent him from executing on the judgment lien. The uncontroverted evidence at trial showed that Clark deeded the property to Ament-Arnold without her or her husband's knowledge. In order to be a fraudulent conveyance, the transfer must be at the hands of the debtor. Beard v. Myers (1959), 136 Mont. 350, 352-53, 347 P.2d 719, 720.

The District Court relied on Montana Nat. Bank v. Michels (1981), 193 Mont. 295, 631 P.2d 1260, to support its findings that the series of transactions at issue contained "badges of fraud" from which the court inferred a fraudulent intent. In Michels, a husband conveyed all of his property to his wife in consideration of the sum of one dollar even though the fair market value of the property was more than $40,000. Michels, 631 P.2d at 1261. Two months later, the wife conveyed the property to the husband's uncle. The consideration for this conveyance included payment of numerous creditors of the husband, none of which was owed by the wife. Michels, 631 P.2d at 1262. In addition, after this conveyance, both husband and wife retained possession of the property and continued to live on it without paying any rent. Michels, 631 P.2d at 1264.

7

Although the District Court found that the series of conveyances in the case before us on appeal contained "badges of fraud" similar to those in Michels, the instant case is distinguishable from Michels in several respects. Unlike the judgment debtor in Michels, where the husband conveyed the property to his wife for one dollar, Arnold did not convey property to his wife. Evidence at trial showed that when Arnold and Ament-Arnold learned of the judgment lien they transferred the property back to the original owners because they were unable to secure financing to pay the obligation secured by the trust indenture. In addition, while in Michels part of the consideration of the sale to the debtor's uncle included paying many of the judgment debtor's creditors, there was no evidence presented in the instant case to show that Arnold received any funds from the subsequent sale of the property by Ament-Arnold to Hayes. Finally, while the debtor in Michels continued to live on the property without paying rent, there was no evidence presented in the instant case to show that Arnold retained any possession or control over the property or the proceeds from the sale of the property.

It remained Jones' burden to prove that the transactions at issue were fraudulent, but there was simply not enough evidence in the record to support a conclusion that he had borne his burden of proof. Applying our test from DeSaye, we conclude that the evidence in the record was not sufficient to support the District Court's findings that the series of transactions at issue were fraudulent. Accordingly, we hold that the District Court's

8

findings were clearly erroneous and we reverse the decision of the District Court in that respect.

## Issue 2

Did the District Court err by failing to determine that the judgment lien was extinguished by operation of law, thus terminating any rights the plaintiff may have to the subject property?

In order to resolve this issue, it is necessary to keep in mind that there is a difference between a judgment and the lien on real property that is created when a judgment is docketed (judgment lien). Moreover, it is also important to acknowledge that Montana's statutes provide for distinct times during which a judgment may be enforced, during which an execution on a judgment may be issued, and during which a judgment lien encumbers real property. Finally, one must also appreciate that the ability to execute on a judgment is distinct from whatever additional advantages that a judgment creditor may acquire by virtue of his judgment creating a lien on real property. We will discuss these various legal principles in the context of the facts of this case and the District Court's decision.

To summarize the following discussion, Montana law provides in separate statutes that a judgment may be enforced for a period of 10 years from docketing, § 27-2-201(1), MCA; that a writ of execution may be issued to enforce a judgment for a period of 6 years from entry, § 25-13-101, MCA, which period may be extended by the court for up to an additional 4 years, § 25-13-102, MCA, and

9

Welch v. Huber (1993), 262 Mont. 114, 862 P.2d 1180; that a judgment lien continues for 6 years following docketing of the judgment and then expires by operation of law, § 25-9-301(2), MCA; and that a judgment may be extended past its 10 year duration only by filing a separate action to obtain a judgment on the judgment, § 27-2-201(1), MCA, and Welch, 862 P.2d at 1181.

In this case, the District Court stated in its findings of fact that Jones' March 10, 1986, judgment had been "renewed for an additional six year period beginning March 23, 1992." This finding stems from Jones' motion to renew the judgment filed on March 10, 1992, which the District Court granted by order on March 23, 1992. Our review of the District Court's conclusions of law is plenary. We simply determine whether the trial judge's interpretation of the law is correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. We conclude that the court's finding that the judgment, and, implicitly, its legal conclusion that the judgment lien was "renewed" are incorrect.

Under Montana law, liens are creatures of statute. Matter of Estate of Wilhelm (1988), 233 Mont. 255, 262, 760 P.2d 718, 723. With respect to liens created by entry of judgment, the applicable statute provides:

> From the time the judgment is docketed, it becomes a lien upon all real property of the judgment debtor not exempt from execution in the county, owned by the judgment debtor at the time or which the judgment debtor may afterward acquire until the lien ceases.

Section 25-9-301(2), MCA. Moreover, the judgment lien so created continues for 6 years unless the judgment is previously satisfied.

10

Section 25-9-301(2), MCA.

Jones' judgment lien sprang into existence and attached to any and all real property, not exempt from execution, owned by Arnold in Missoula County as of March 10, 1986, the date his judgment against Arnold was docketed. That lien continued to exist until it expired by operation of § 25-9-301(2), MCA, 6 years from and after March 10, 1986. Moreover, under § 25-9-301(2), MCA, that judgment lien attached to the real property which is the subject of this case when Arnold and his wife purchased the property on February 10, 1989. However, a judgment lien can only attach to the actual interest of the judgment debtor and is subject to all prior liens, whether equitable or legal. Hannah v. Martinson (1988), 232 Mont. 469, 472, 758 P.2d 276, 278-79.

Section 25-13-101(1), MCA, provides that "the party in whose favor the judgment is given may, at any time within 6 years after the entry thereof, have a writ of execution issued for its enforcement." Accordingly, Jones could have executed on Arnold's interest in the subject property, during the 6 years from and after March 10, 1986. Section 25-13-101(1), MCA. Furthermore, during the 6-year period that the judgment was a lien, Jones' ability to execute on Arnold's interest in the subject real property was not impaired by the subsequent transfers since the lien follows the property. Furthermore, any judgment or decree of any court of this state affecting real property is deemed to impart notice to subsequent purchasers or encumbrancers. Section 25-g-105, MCA. Once a judgment *lien* expires by operation of § 25-9-301(2), MCA,

11

however, there is no statutory provision which allows the *lien* to continue past the original 6 years provided by § 25-9-301(2), MCA, or allows it to be "renewed." In other words, on March 10, 1992, Jones' judgment lien on the subject real property terminated and the property thereafter existed free of the judgment lien.

While the judgment *lien* expired, that is not to say, however, that the *judgment* itself could not be enforced following the expiration of the lien. Section 25-13-102, MCA, provides:

> In all cases, the judgment may be enforced or carried into execution after the lapse of 6 years from the date of its entry by leave of the court, upon motion, or by judgment for that purpose founded upon supplemental pleadings.

Accordingly, Jones' judgment *lien* on the subject real property terminated by operation of law on the expiration of 6 years from March 10, 1986. The March 10, 1986, judgment continued to exist, however. Thereafter, if Jones desired to execute on that judgment, it was incumbent upon him to obtain a new execution upon motion by leave of court or by judgment for that purpose founded upon supplemental pleadings, in accordance with § 25-13-102, MCA.

In that respect, and assuming that the procedure set forth in § 25-13-102, MCA, is followed, our recent decision in Welch v. Huber (1993), 262 Mont. 114, 862 P.2d 1180, comes into play. In that case we held that while the time to execute on a judgment could be extended beyond the original 6 years, that time could not be extended beyond the 10 years provided for actions on judgments under.5 27-2-201(1), MCA. Welch, 862 P.2d at 1181. Applying those legal principles here, while Jones could obtain an execution on the

12

March 10, 1986, judgment following the expiration of the 6-year execution period, pursuant to § 25-13-102, MCA, his ability to obtain such further execution was limited to an additional 4 years.

Importantly, and contrary to the District Court's March 23, 1992, order, the original March 10, 1986, judgment was not "renewed." That judgment continued to exist; the judgment lien, however, terminated permanently on the expiration of 6 years from March 10, 1986, and that lien was not "renewed" under the court's March 23, 1992, order.

Moreover, the District Court's finding that the judgment was renewed for "an additional six year period beginning March 23, 1992," is also incorrect. In <u>Welch</u> we held that while a judgment cannot be extended past 10 years by ex parte motion, nevertheless, a judgment creditor may file an action to extend a district court's judgment beyond its initial lo-year duration. <u>Welch</u>, 862 P.2d at 1181. In other words, enforcement of a judgment is barred by § 27-2-201(1), MCA, after the judgment's lo-year duration has expired. <u>Welch</u>, 862 P.2d at 1181. If before that lo-year duration expires the judgment creditor desires to extend the judgment past 10 years, then he must file a separate action on the existing judgment and obtain a new judgment. Section 27-2-201(1), MCA; <u>Welch</u>, 862 P.2d at 1181. From the date that the new judgment on the original judgment is docketed, then it also follows that a new 6 year judgment lien commences to run (§ 25-9-301(2), MCA), and that the provisions of § 25-13-101(1), MCA, § 25-13-102, MCA, and § 27-2-201(1), MCA, would apply, as discussed above.

13

Accordingly, we hold that the District Court erred by failing to determine that Jones' judgment lien was extinguished by operation of § 25-9-301(2), MCA, on the expiration of 6 years from March 10, 1986.

Reversed.

_____
Justice

We concur.

_____
Chief Justice

_____

_____

_____

_____
Justices

14

Justice Fred J. Weber dissents as follows:

Issue 1 considers whether the District court erred in determining that the series of conveyances were fraudulent. In substance, the opinion concludes that Jones failed to present any evidence which would indicate that the subsequent purchase of the property by Ament-Arnold's stepfather and the later transfer of the property to Ament-Arnold was done with an attempt to defraud Jones and to prevent him from executing on the judgment lien. The opinion concludes that the uncontroverted evidence showed that Clark deeded the property to Ament-Arnold without her or her husband's knowledge. I do not agree with those conclusions. The opinion further emphasizes that it was Jones' burden to prove the transactions were fraudulent and there was simply not enough evidence to support a conclusion that "he had born his burden of proof." While that conclusion may be correct with regard to Jones only, I believe that it is essential to consider the entire transcript which is primarily the testimony on the part of Gary Arnold (Arnold) and Janise Arnold (Ament-Arnold). I emphasize it is the testimony of the two Arnolds which convinced the District Court that the transactions were fraudulent.

After reviewing the transcript and other evidence, I conclude there is a sufficient basis to affirm the majority of the findings of fact of the District Court. Without exactly quoting, the following are the key aspects of various findings of fact:

1. Jones obtained a judgment against Arnold on March 10, 1986.

15

2. On February 10, 1989, Arnold and Ament-Arnold purchased the property under a contract for $11,000.

4. On April 10, 1989, the Arnolds quitclaimed the property back to Sipes (original sellers).

5. On April 18, 1989, Sipes deeded the property by warranty deed under a trust indenture to James Clark, stepfather of Ament-Arnold.

6. On May 10, 1989, James Clark quitclaimed the property back to his stepdaughter, Janise Arnold, using the name of "Janise Ament, a married woman in her own right."

7. On December 12, 1990, Janise Arnold (Ament-Arnold) sold the property to Hayes for $38,500.

8. The property's present buyers made payments into an escrow to Janise Arnold (Ament-Arnold)--the proceeds of the escrow have a balance of $23,936.11.

Here I wish to emphasize finding of fact 9 which was incorrect as a matter of law and which I believe has essentially caused the misdirection of the opinion. Finding of fact 9, in effect, pointed out that the series of transfers had the effect of removing Arnold from the title--," [t]his prevented execution against the property by Jones"--while the Arnolds retained the ultimate benefit of the transaction. As a matter of law, as pointed out by the opinion, that is of course incorrect. The lien of Jones' judgment attached to any interest which Arnold had in the property at the time Arnold and Ament-Arnold gained an interest of record. However, I do not conclude that negates the balance of the findings and conclusions of the District Court.

16

Finding of fact 10 stated in substance that the series of conveyances and transfers between husband and wife to stepfather via the original sellers and back to the wife in her maiden name contained the following badges of fraud from which the court inferred a fraudulent intent:

(a) Lack of consideration of the conveyance from stepfather to Ament-Arnold who is identified by her maiden name in the quitclaim deed.

(b) Familial relationship between stepfather and Ament-Arnold and also between Ament-Arnold and Arnold. The effect of the transfers was to transfer the property from husband and wife to wife alone.

(c) Arnold and Ament-Arnold knew at the time of the conveyances that Jones had an outstanding judgment against Arnold.

(d) The quitclaim deed from stepfather to Ament-Arnold was not filed until seventeen months after it was executed and just two months before Ament-Arnold sold the property. The court inferred that the Arnolds may not have wanted Jones to know about the transfers.

(e) It is an unusual method of business for property to change hands three times in one month--Arnolds to Sipes to stepfather to Ament-Arnold.

(f) The series of transactions had the effect of removing Arnold from the title while allowing Arnold and Ament-Arnold to obtain possession of the property and reap the benefit of the sale.

14. The Arnolds' conduct, resulting in the transfer from both of the Arnolds to Ament-Arnold in her maiden name, was designed to

17

frustrate plaintiff's efforts at executing on his judgment and to unjustly enrich the Arnolds.

In a brief summary, I will review testimony on the part of Arnold and Ament-Arnold at trial. Arnold testified he did tell his wife's stepfather about the purchase of the property and did tell him they were not able to buy it and that the stepfather decided to buy it on his own account. Arnold then professed that he had nothing to do with the stepfather's dealing with the property, including the terms of the purchase. Arnold said that he was not interested in the purchase and that Ament-Arnold had nothing to do with the fact the stepfather purchased the property. He concluded by saying "it was bought for himself." I emphasize this in order to point out the contradiction between this and the actual effect of the transaction. It is clear that the District Court had substantial credible evidence to conclude this was a fabrication on the part of Arnold.

Ament-Arnold testified that they talked to an attorney who prepared the papers which they signed. She also stated she and Arnold had dinner at her parents' house and discussed with them what had happened. She told her stepfather about it and the stepfather indicated to her that it would have been a good deal. The stepfather was interested in the property. Ament-Arnold stated that the stepfather was doing something for himself when he bought the property. She further contended she had made no arrangements with him. It is significant here to keep in mind that the Arnolds quitclaimed the property back to the Sipes on April 10, 1989; the Sipes deeded the property to the stepfather on April 18, 1989; and

18

the stepfather deeded the property back to Ament-Arnold on May 10, 1989. Again, it is clearly possible for the District Court to conclude that the testimony was a fabrication. The District Court heard and observed the witnesses.

Amend-Arnold testified with regard to the deed from the stepfather to herself. The deed was kept in his safety deposit box for the next year and a half. That way, if the stepfather died, the property would go to Ament-Arnold.

Ament-Arnold then testified as to how the stepfather was using the proceeds of the sale as a loan to her. She contended the monies would come to her as a loan and she would have to pay the stepfather back. She had emphasized that her stepfather was not in good health. She testified that if her stepfather died then she would pay the estate back the amount of money. Consider this testimony along with the following with regard to the method of taxation.

In testifying that she received the property as a loan, Ament-Arnold stated she had to pay the loan back with interest. When questioned by the District Court, she stated that she paid both the state and federal income tax on the money received from the sale of the property, and that the payment of these taxes was considered to be interest by her stepfather. Again the testimony here clearly affords a basis for the District Court to conclude that, in fact, the entire transaction was considered by the stepfather and the Arnolds to be an original sale by Ament-Arnold under which she would have to pay the income taxes due as a result of the gain from the sale. We may also note the inconsistency between her payment

19

of income taxes and her original claim that the stepfather purchased this for his own benefit.

In its conclusions of law, the District Court held that the badges of fraud identified in the findings of fact demonstrated that the Arnolds engaged in a series of conveyances with the actual intent to hinder, delay or defraud Jones. The District Court concluded the evidence was clear and convincing that the Arnolds acted with actual malice.

Applying the DeSaye test, I conclude there is substantial evidence which a reasonable mind could accept as adequate to support the conclusions of the District Court. I would, therefore, affirm the District Court's determination that the series of conveyances was fraudulent. I would not find it necessary to determine the question as to the extinguishment of the judgment lien by operation of law as set forth in issue 2. I would affirm the District Court.

_____
Justice

Chief Justice J.A. Turnage concurs in the foregoing dissent.

_____
Chief Justice

August 11, 1995

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Raymond P. Tipp
TIPP & BULEY
P.O. Box 3778
Missoula, MT 59806

DONTORGENRUD
Attorney at Law
P.O. Box 490
St. Ingnatius, MT 59865

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy